# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **UNITED STATES** | **CRIMINAL ACTION** |
| **VERSUS** | **NO: 16-36** |
| **LUIS COTTO** | **SECTION: "S" (1)** |

## ORDER AND REASONS

**IT IS HEREBY ORDERED** that Defendant's Motion to Suppress Evidence and Statements (Doc. #225) is **DENIED**.

## BACKGROUND

This matter is before the court on a motion to suppress filed by defendant, Luis Cotto. Cotto argues that the evidence obtained and statements he made during a traffic stop in Oklahoma on August 7, 2016, should be suppressed because they were the fruits of an unlawful search of his vehicle.

On April 27, 2018, Cotto was charged by the Grand Jury in a Third Superseding Indictment. Count 1 charges Cotto with conspiring with his co-defendants to distribute and posses with the intent to distribute cocaine hydrochloride, heroin and marijuana in violation of 21 U.S.C. § 846. The conspiratorial overt act attributed specifically to Cotto states:

> On or about August 7, 2016, **LUIS J. COTTO, a/k/a "Luis Pereira,"** did possess and transport approximately $225,505.00 in United States currency.

Count 1 attributes to Cotto one kilogram or more of heroin, and five kilograms or more of cocaine hydrochloride. Count 12 charges Cotto with using a communications facility, namely a telephone, on September 19, 2015, in committing, causing and facilitating the commission of conspiracy to distribute and possess with the intent to distribute heroin, cocaine hydrochloride and marijuana in violation of 21 U.S.C. § 843(b) and 18 U.S.C. § 2.

Count 1 is premised on evidence obtained from Cotto's vehicle and statements he made to a law enforcement officer on August 7, 2016. Cotto argues such evidence should be suppressed because the search of his vehicle and seizure of the evidence performed on that date was improper. On June 14, 2018, this court held an evidentiary hearing on Cotto's motion to suppress.

At the hearing on Cotto's motion to suppress, Oklahoma State Trooper Steven Hamilton testified as to the facts regarding the traffic stop of Cotto's vehicle on August 7, 2016. Trooper Hamilton has been a law enforcement officer since 1998. He currently works as a criminal interdictor and canine handler in Currant County, Oklahoma along Interstate 44, and works to disrupt criminal activity along a highway that is known as drug trafficking corridor. Trooper Hamilton has participated in over 10,000 traffic stops, and testified in court approximately 100 times in his capacity as a law enforcement officer.

Trooper Hamilton testified that at about 9:00 a.m. on August 7, 2016, he was patrolling a section of Interstate 44 known as the Will Rogers Turnpike facing northwest with a clear view of the traffic. Trooper Colby Rohr, another Oklahoma State Trooper and canine handler, was patrolling the same area in a separate vehicle. At around 9:03 a.m., Trooper Hamilton observed Cotto, who was driving a maroon four-door Honda, fail to signal a lane change, which is a violation of Oklahoma state law. Trooper Hamilton was about 20 to 30 car lengths away at the time. Trooper Hamilton then started to follow Cotto and observed Cotto again fail to signal a lane change when he was approaching the toll booth. This time, Trooper Hamilton was about 10 to 15 car lengths behind Cotto. Once Cotto passed through the toll booth, Trooper Hamilton initiated the traffic stop, which was about a minute or two after Cotto committed the traffic violations. The audiovisual recording

2

device in Trooper Hamilton's vehicle was activated when Trooper Hamilton turned on his lights to initiate the traffic stop.

Trooper Hamilton testified, and the video recording shows, that he approached Cotto's vehicle on the passenger's side. Trooper Hamilton testified that he looked inside the car and saw evidence of "hard travel" consisting of empty fast food and drink containers. Trooper Hamilton observed that Cotto appeared to be sweating, with a pulsating carotid artery and trembling hands. Trooper Hamilton requested Cotto's driver's license and insurance information. Trooper Hamilton noted that Cotto's vehicle had New York license plates, and was registered to and owned by Cotto, who is a resident of New York.

Trooper Hamilton asked Cotto to sit in the front passenger's seat of the patrol car with the door unlocked. Cotto forgot to close the door of his car, and Trooper Hamilton reminded him to do so. Trooper Hamilton characterized this action as an inability to multitask on Cotto's part because he probably had other things on his mind.

Trooper Hamilton and Cotto both sat in the front seat of the air conditioned patrol vehicle. Cotto was not handcuffed, his door was unlocked and Trooper Hamilton did not tell Cotto that he could not leave. Trooper Hamilton maintained a calm tone of voice and engaged Cotto in "casual conversation" while preparing a courtesy warning regarding the traffic violation. Trooper Hamilton asked Cotto what brought him to Oklahoma. Cotto replied that he was going to Kermit, Texas to see his uncle and sell him the Honda, and that he was going to see some of his tenants who had plumbing problems and were ordering too much pay-per-view. Trooper Hamilton testified that he noticed that Cotto was nervous while in the patrol car exhibiting sweating, pulsating carotid artery, labored breathing, avoidance of eye contact and a quivering stomach. Trooper Hamilton also

3

observed that Cotto's comments did not make sense. Cotto had bought the car only two weeks prior and had paid for two year's worth of car insurance for it.

Trooper Hamilton testified that based on his years of law enforcement experience under the totality of circumstances, considering the evidence of "hard travel", Cotto's physical appearance and body language, and Cotto's implausible travel plans, caused him to believe that Cotto was involved in criminal activity. Trooper Hamilton ran warrants and criminal history checks on Cotto. Cotto did not have any outstanding warrants or criminal history. Trooper Hamilton issued Cotto a warning for the traffic violation and told him he could go free. Trooper Hamilton noticed that Cotto's hands felt sweaty. Cotto began to exit the patrol car 12 minutes and 20 seconds after the initiation of the traffic stop.

As Cotto exited the patrol car, Trooper Hamilton asked Cotto to engage in consensual conversation. Cotto reentered the patrol car. Trooper Hamilton asked Cotto if everything in the car was his and asked him about involvement in criminal activity, including drugs, guns and bulk currency. Cotto stated that everything in the car was his, and denied involvement in criminal activity. Trooper Hamilton requested permission to search Cotto's vehicle, which Cotto denied. Trooper Hamilton then told Cotto that he was being detained for a dog sniff of the vehicle. Thereafter, Cotto stated that there was some marijuana in the vehicle and $4,500 for plumbing costs.

Trooper Hamilton called on the radio for the canine unit and stated that the search would proceed as a "refusal." Trooper Rohr arrived with his police service dog Spyder at the scene within 30 seconds after the call and began the search. Within 35 seconds be beginning the sniff, Spyder alerted to the scent of drugs. Trooper Rohr performed a pat down on Cotto. Troopers Hamilton and Rohr searched the vehicle. They found marijuana in the center consol and $4,500 in a zipper bag

4

behind the seat. Troopers Hamilton and Rohr also discovered that the back passenger door was heavier than normal, made noise when it was moved, and appeared to have been tampered with. Trooper Hamilton testified that there was axle grease on the door, which indicates that Cotto was trying to cover his tracks and re-secure the door. The officers removed the door panel and found more than $230,000 in legitimate and counterfeit United States currency hidden inside. Cotto was handcuffed and evidence was seized, including the money, 1 gram of marijuana, plastic packing and rubber bands, 1 black Samsung Verizon flip cell phone, 1 black Samsung Galaxy S6 cell phone, 1 white Samsung tablet, 1 black Tom Tom GPS.

Cotto seeks to suppress the evidence obtained and statements he made to law enforcement officers during the August 7, 2016 traffic stop, arguing that they were the fruits of an illegal search of his vehicle. Cotto contests the validity of the initial traffic stop arguing that there is no proof that he committed a traffic violation. Cotto also argues that Trooper Hamilton lacked reasonable suspicion to continue the detention and order the dog sniff of his vehicle.

The government argues that Trooper Hamilton's testimony and the video recording of the traffic stop prove that Trooper Hamilton had a valid reason to initiate the traffic stop and had probable cause to conduct the search. Trooper Hamilton testified that he saw Cotto twice fail to signal a lane change, which violated Oklahoma traffic law and was the reason for the stop. Trooper Hamilton also testified that under the totality of the circumstances he had reason to believe that Cotto was involved in criminal activity.

## ANALYSIS

The Fourth Amendment to the Constitution of the United States protects individuals from unreasonable searches and seizures:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. Although the Fourth Amendment is silent on the suppression of evidence obtained in violation thereof, the prudential "exclusionary" rule may be used to suppress evidence where doing so would "deter future Fourth Amendment violations." Davis v. United States, 131 S.Ct. 2419, 2426 (2011). "The exclusionary rule prohibits introduction at trial of evidence obtained as the result of an illegal search or seizure [and] excludes not only the illegally obtained evidence itself, but also other incriminating evidence derived from that primary evidence." United States v. Runyan, 275 F.3d 449, 466 (5th Cir. 2001) (citing Silverthorne Lumber Co. v. United States, 40 S.Ct. 182 (1920)). Further, "the exclusionary rule encompass[es] evidence that is the indirect product or 'fruit' of the unlawful police conduct." Id. (citing Wong Sun v. United States, 83 S.Ct. 407 (1963)).

The Supreme Court of the United States has stated that "[i]t is a 'basic principal of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.'" Brigham City v. Stuart, 126 S.Ct. 1943, 1947 (2006) (quoting Groh v. Ramirez, 124 S.Ct. 1284, 1290; Payton v. New York, 100 S.Ct. 1371, 1380 (1980)). However, that Court has also recognized that "the warrant requirement is subject to certain reasonable exceptions," because "[t]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'" Kentucky v. King, 131 S.Ct. 1849, 1856 (2011) (citing and quoting Brigham City, 126 S.Ct. at 1947). The government has the

burden of establishing circumstances that justify a warrantless search. United Stats v. Wallen, 388 F.3d 161, 164 (5th Cir. 2004) (citations omitted).

Traffic stops are seizures for the purpose of the Fourth Amendment. United States v. Lopez-Moreno, 420 F.3d 420, 430 (5th Cir. 2005). An officer can stop a vehicle when he has "'probable cause to believe that a driver is violating any one of the multitude of applicable traffic and equipment regulations.'" Whren v. United States, 116 S.Ct. 1769, 1776 (1996) (quoting Delaware v. Prouse, 99 S.Ct. 1391, 1400 (1979)). Prouse "noted approvingly that the foremost method of enforcing traffic and vehicle safety regulations . . . is acting upon observed violations, which afford the 'quantum of individualized suspicion' necessary to ensure that police discretion is sufficiently constrained." Id. (internal quotations and citations omitted).

"The legality of a traffic stop is analyzed under the framework articulated in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)." Lopez–Moreno*,* 420 F.3d at 430. Under the two-part Terry test, "[t]he court must evaluate (1) whether the officer's action was "justified at its inception," and (2) whether the officer's subsequent actions were "reasonably related in scope to the circumstances which justified the interference in the first place." United States v. Smith, 506 Fed. Appx. 319 (5th Cir. 2013) (citing Lopez-Moreno, 420 F.3d at 430).

**A. Whether the Officer's Actions were Justified at the Inception of the Stop**

In this case, Trooper Hamilton's action of stopping Cotto was justified at its inception because Trooper Hamilton observed Cotto violate a traffic law. Okla. Stat. tit. 47 §11-1401(K) states that "[n]o vehicle shall move from one lane to another unless the way is clear to do so and upon proper signaling." Trooper Hamilton testified that he pulled Cotto over after he observed Cotto twice fail to signal when he was changing lanes. Therefore, the initial stop was justified.

### B. Whether the Officer's Subsequent Actions were Reasonably Related in Scope to the Circumstances which Justified the Interference in the First Place

As to the second prong, the "detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop, but if further reasonable suspicion emerges during the stop and is supported by articulable facts, detention may continue until the new reasonable suspicion has been dispelled or confirmed." United States v. Swan, 259 Fed. Appx. 656, 659 (5th Cir. 2007) (quotations and citations omitted). The United States Court of Appeals for the Fifth Circuit "frequently concludes that a search is not reasonably related to the circumstances justifying a traffic violation stop when the search in question occurs after the time required for an officer to issue a citation (or decide against doing so) and to complete a 'computer check' for outstanding warrants and vehicle theft." United States v. Cavitt, 550 F.3d 430, 436 (5th Cir. 2008). "Accordingly, '[o]nce the purpose of a valid traffic stop has been completed and an officer's initial suspicions have been verified or dispelled, the detention must end unless there is additional reasonable suspicion supported by articulable facts,' – suspicion, that is, of criminal activity 'additional' to the suspicion that justified the initial stop.'" Id. (quoting United States v. Estrada, 459 F.3d 627, 631 (5th Cir. 2006)). In Rodriguez v. United States, 135 S.Ct. 1609, 1614-15 (2015), the Supreme Court of the United States held that police may not routinely "extend an otherwise-completed traffic stop, absent reasonable suspicion, in order to conduct a dog sniff."

In this case, it is undisputed that the traffic stop had concluded when the dog sniff of the vehicle was conducted. Trooper Hamilton issued Cotto a courtesy warning and told him that he was free to go. Thereafter, Trooper Hamilton asked Cotto to engage in consensual conversation, and

Cotto reentered the patrol car at which time Trooper Hamilton questioned Cotto about illegal activities and requested permission to conduct the dog sniff.

In order to continue a detention after the point where the traffic citation is issued or the officer decides not to issue one, "the officer must have reasonable suspicion supported by articulable facts that a crime has been or is being committed." Cavitt, 550 F.3d at 436 (quoting United States v. Santiago, 310 F.3d 336, 341-42 (5th Cir. 2004)). "Reasonable suspicion 'exists when the detaining officer can point to specific and articulable facts that, when taken together with rational inference from those facts, reasonably warrant the search and seizure.'" Id. (quoting Estrada, 459 F.3d at 631). Reasonable suspicion is evaluated by examining the totality of the circumstances of the case to determine "whether the detaining officer ha[d] a particularized and objective basis for suspecting legal wrongdoing." United States v. Arvizu, 122 S.Ct. 744, 750 (2002) (citations omitted). "This process allows officer to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." Id. at 750-51 (citations and quotations omitted).

"Reasonable suspicion must be based on more than the officer's sense that a detainee appears to have something to hide." Cavitt, 550 F.3d at 437. Although an officer's reliance on a mere 'hunch' is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." Arvizu, 122 S.Ct. at 751 (citations omitted).

Cotto argues that Trooper Hamilton lacked reasonable suspicion to detain him for a dog sniff of the vehicle. Cotto argues that Trooper Hamilton did not observe any physical evidence indicating

9

that Cotto was concealing contraband within the vehicle, but rather had a hunch based on Cotto's alleged nervous appearance and inconsistent statements coupled with the observation of the fast food wrappers and drink containers in the vehicle. Thus, Cotto argues that Trooper Hamilton did not have reasonable suspicion to conduct the dog sniff and any evidence obtained therefrom must be suppressed.

Trooper Hamilton's testimony establishes that he did have articulable facts under the totality of the circumstance that raised reasonable suspicion that criminal conduct was afoot. In <u>United States v. Pack</u>, 612 F.3d 341, 361 (5th Cir. 2010), the United States Court of Appeals for the Fifth Circuit held that defendant's extreme nervousness, implausible story, and the fact that he was traveling along a drug trafficking corridor were enough for a law enforcement officer with 17 years of experience to form a reasonable suspicion of criminal activity during a traffic stop. In <u>Pack</u>, the court found it reasonable for the officer to call in a canine to resolve his suspicion unit after the defendant refused consent to search the vehicle. <u>Id.</u>

In this case Trooper Hamilton testified that he has been a law enforcement officer for 20 years and he currently patrols Interstate 44, a known drug trafficking corridor, with the purpose of disrupting criminal activity. Trooper Hamilton has conducted thousands of traffic stops. Trooper Hamilton testified that, with his substantial law enforcement experience, the totality of the circumstances led him to believe that Cotto was involved in illegal activity. Trooper Hamilton articulated specific facts that led to this conclusion, such as Cotto's traveling in a vehicle with out-of-state license plates on a known drug trafficking route; the empty fast food and drink containers strewn in the vehicle, which indicate "hard travel" where the driver does not want to stop; Cotto's

10

inability to multitask in forgetting to close his door; Cotto's physical appearance such as, pulsating carotid artery, trouble breathing, trebling hands, sweating while in air conditioning, avoiding eye contact, and quivering stomach; and, Cotto's giving inconsistent and implausible answers to Trooper Hamilton's questions. These facts taken together established that Trooper Hamilton had a reasonable suspicion based on articulable facts that criminal activity was afoot and he was justified in calling in a canine unit to resolve his suspicions after Cotto refused permission to search the vehicle. The government has carried its burden of establishing circumstances that justify a warrantless search, and Cotto's motion to suppress is DENIED.

## CONCLUSION

**IT IS HEREBY ORDERED** that Defendant's Motion to Suppress Evidence and Statements (Doc. #225) is **DENIED**.

New Orleans, Louisiana, this __2nd__ day of July, 2018.

_____
**MARY ANN VIAL LEMMON
UNITED STATES DISTRICT JUDGE**